January 11, 1978

**78-1    MEMORANDUM OPINION FOR THE
         GENERAL COUNSEL, CONSUMER
         PRODUCT SAFETY COMMISSION**

### Consumer Product Safety Commission— Former Officers and Employees—Accepting Private Employment

This is in response to your inquiry whether § 4(g)(2) of the Consumer Product Safety Act, 86 Stat. 1210-11, as amended, 15 U.S.C. § 2053(g)(2) (1977 Supp.), bars a Consumer Product Safety Commission employee from accepting a position with Montgomery Ward Company.

Section 4(g)(2) provides in pertinent part that:

> No regular officer or employee of the Commission who was at any time during the 12 months preceding the termination of his employment with the Commission compensated at a rate in excess of the annual rate of basic pay in effect for grade GS-14 of the General Schedule, shall accept employment or compensation from any manufacturer subject to this chapter, for a period of 12 months after terminating employment with the Commission.

As we understand the situation, the employee has been offered a position with Montgomery Ward handling credit-related matters. Montgomery Ward stated that the position entails no Commission-related work in the consumer area. The employee's grade level is GS-15 and she has been with the Commission for over 3 years. She states that during this time she has had no dealings with Montgomery Ward in her capacity as a Commission employee.

We understand further that Montgomery Ward is generally known as one of the largest retailers in the country and is not engaged in manufacturing in the sense that it makes any of its products. Montgomery Ward, does, however, import approximately 8 – 10 percent of its retail consumer products for sale in its department stores. This importation gives rise to the problem.

Section 4(g)(2) only prohibits post-Commission employment with manufacturers; and although Montgomery Ward is not a manufacturer in the usual meaning of that term, § 3(a)(4), 15 U.S.C. § 2052(a)(4), of the Act defines a

"manufacturer" to include "any person who manufactures or imports a consumer product." Therefore, a literal interpretation of the language of § 3(a)(4) would result in Montgomery Ward's classification as a "manufacturer" for purposes of the Act. On that basis the employee would be barred from accepting the position with Montgomery Ward. We believe, however, that the postemployment bar of § 4(g)(2) was not intended to be construed in this manner.

Section 3(a)(4), by including importers within the definition of manufacturers, sought to insure that consumer products would not escape regulation of the Commission merely because they were manufactured abroad and imported into the United States. H. Rept. No. 92-1153, 92d Cong., 2d sess. (1972), at 28, states:

> . . . to assure parity of regulation, importers are made subject to the
> same responsibilities as domestic manufacturers.

Importers are thus subject to the regulatory authority of the Commission as are manufacturers. Therefore, a Commission employee could theoretically abuse his or her position to secure the improper advantages condemned in H. Rept. No. 1153, *supra*, with importers as well as with traditional manufacturers. Consequently, § 4(g)(2) applies to importer-employers with the same force that it applies to manufacturers-employers.

Montgomery Ward, however, is only incidentally involved in importation. It is in business primarily as a retailer. If a retailer imported but one item, it would technically fall within the definition of a manufacturer under § 3(a)(4). To bar employment of a former Commission employee with a retail company that imported one insubstantial item would not effectuate the intent behind §.4(g)(2); it would be absurd to assume that a Commission employee could so use his position in this insignificant case as leverage to secure subsequent employment with that company. When the application of a statute's literal language leads to an absurd result, it is generally safe to assume that the result is inconsistent with Congress' purpose in enacting the statute. *United States* v. *Bryan*, 339 U.S. 323, 338 (1950). *Cf. United States* v. *Brown*, 333 U.S. 18, 25-26 (1948) (penal statutes), and *Glickstein* v. *United States*, 222 U.S. 139, 142-43 (1911). Application of the literal language of the Act to the above hypothetical would lead to such a result.

Nonetheless, there necessarily comes a point when a growing importation business of a retail company reaches a level of importation such that the company must be considered an importer, and thus a manufacturer for the purposes of § 4(g)(2). Given the particular facts of this case, we believe that Montgomery Ward has not yet reached that point.[1]

---

[1]We think it important to note that in the present case the employee has no dealings with Montgomery Ward in her capacity as a Commission employee. Further, she will not be working with the importing arm of that company. Given these facts, we believe that she would be working for Montgomery Ward-the-retailer and not Montgomery Ward-the-importer. This distinction, which we think meaningful in the case at hand, might become artificial and impracticable if the importation business increased so that it were no longer incidental to the retail business.

2

Apart from the above, it has been suggested that the failure of § 4(g)(2) to make explicit reference to retailers was inadvertent, because the legislative intent was to prevent persons from using a Commission position to secure employment or future clients from the "regulated industry," and because the term "regulated industry" in its common usage encompasses retailers as well as manufacturers.[2] We disagree. The pertinent legislative history of § 4(g)(2) states that the section was designed to

> . . . assure that persons will not seek employment with the agency or use their Federal office as a means of subsequently gaining employment in the regulated industry or as a means of acquiring members of industry as future clients. H. Rept. No. 92-1153, *supra*, at 30.

A fair reading of the legislative history reveals that the term "industry" was intended to include only manufacturers. In H. Rept. No. 1153, *supra*, at 26, the House Committee on Interstate and Foreign Commerce stated:

> In addition to the need to establish comprehensive and effective regulation over the safety of unreasonably hazardous consumer products, there is a need to insure that the procedures relating to consumer products are fair to both *industry* and consumers. The Committee heard extensive testimony from *manufacturers* and trade associations documenting some of the potential difficulties that might be faced in complying with the regulations of a product safety agency. This testimony convinces the Committee that it is essential to establish both an effective and fair product safety program, *impacting to the minimum practicable on the manufacturing process.* In addition, an effective consumer safety program must insure an adequate opportunity for participation and judicial review by consumers and *regulated industries.* [Emphasis added.][3]

The above quotation indicates that manufacturers were the relevant entities in the "regulated industry" to which the Committee refers. Therefore, we can discover no inconsistency in the legislative history in Congress' clear intent to omit "retailers" from the coverage of § 4(g)(2).

A review of the language of the Act itself is also helpful in ascertaining congressional intent on this point. The Act refers to both "retailers" and "manufacturers" in other provisions[4] while § 4(g)(2) omits any reference to retailers. Thus, we can infer that retailers were not intended to be covered by that section. This view of statutory construction has found expression in the

---

[2]The Commissioner has expressed this view. Although he is of the opinion that § 4(g)(2) intended to extend the postemployment bar to those who engage in any importing he would not enforce this provision in this case for equitable reasons.While it is clear that § 4(g)(2) cannot apply to retailers since they are not referred to in that section, we understand the Commissioner's argument to be that any retailer who may technically come within the definition of "manufacturer" in § 3(a)(4) should be considered a barred employer because Congress intended to include retailers in the prohibition of § 4(g)(2).

[3]*See also* H. Rept. No. 1153, *supra.* pp. 22, 23.

[4]*See, e.g.,* 15 U.S.C. §§ 2055(b)(1), 2064(b) through 2064(e) (§ 2064(d) amended by Pub. L. No. 94-284, 90 Stat. 508, as codified in 15 U.S.C. § 2064(d)).

3

maxim *expressio unius est exclusio alterius*. Sutherland, *Statutory Construction*, § 47.23 (4th ed.,1973), in explaining this maxim, states:

> As the maxim is applied to statutory interpretation where a form of conduct, the manner of its performance and operation, and the persons and things to which it refers are designated, there is an inference that all omissions should be understood as exclusions . . . .
>
> The force of the maxim is strengthened by contrast where a thing is provided in one part of the statute and omitted in another.

This maxim is particularly appropriate in the present situation. Thus, the inference necessarily is that the omission of retailers from § 4(g)(2) was intentional.

As further evidence of congressional intent respecting § 4(g)(2), the term "manufacturer" is used, without any reference to "retailers," throughout the legislative history of that section.[5] This consistency of omission bolsters the argument that those entities were intentionally left out of § 4(g)(2).

In light of the foregoing, it is our opinion that Congress had no intention of applying the prohibition of § 4(g)(2), to retailers.

Therefore, since Montgomery Ward is primarily in business as a retailer—an entity not subject to the postemployment bar of § 4(g)(2)—the mere fact that it engages in the modest amount of importing as exists here does not automatically transform it into a barred employer under § 4(g)(2).

In our opinion, the employee may accept the position with Montgomery Ward since § 4(g)(2) does not apply to the facts of this particular case.

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[5] *See* H. Rept. No. 92-1153, *supra* (1972), at 4, 30; H. Conf. Rept. No. 92-1593, 92d Cong., 2d sess. (1972), pp. 4-6.